# High Splint Coal Co. v. District No. 19, United Mine Workers of America, et al.

Oct. 5, 1945.

H. C. Gillis and Robert L. Smith for appellant.

Golden and Lay for appellees.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

This declaratory judgment action was instituted by the High Splint Coal Company against District No. 19, United Mine Workers of America, and certain individual miners, to obtain the construction of a contract between the parties, and to determine whether or not the company was authorized under the contract to make certain deductions from the miners' wages on account of slack and other debris and impurities being loaded with the coal. There is no controversy as to the amount of the deductions which total $12,654.40.

The chancellor's judgment did not formally construe the contract but recites, ''the plaintiff has failed to

show itself entitled to the relief sought, and that the defendants have shown themselves entitled to the relief they sought,'' and decreed that defendants recover of the plaintiff the amount of the deductions, $12,654.40. A reversal is asked because, first, the chancellor did not construe the contract and make a declaration of rights thereunder; second, a recovery of money was adjudged against plaintiff.

While the chancellor did not in so many words construe the contract and declare the rights of the parties, he in effect did by holding that the plaintiff was not entitled to deduct from the miners' wages for the impurities they loaded with the coal, and in adjudging the miners should recover from the Company the $12,654.40 it had deducted from their wages. These two rather direct and simple issues were all that were involved in the declaration of rights sought.

The Company insists that the Declaratory Judgment Act makes no provision for a counterclaim, and that the chancellor was without authority to enter any judgment against it, citing such authorities as 1 C. J. S., Actions, sec. 18, pp. 1018 and 1031; Jefferson County v. Chilton, 236 Ky. 614, 33 S. W. 2d 601; Liberty Warehouse Company v. Burley Tobacco Growers' Cooperative Marketing Association, 276 U. S. 71, 48 S. Ct. 291, 72 L. Ed. 473; Dowdy v. City of Covington, 237 Ky. 274, 35 S. W. 2d 304.

These authorities do not sustain the Company's contention. We cannot see where the text cited or the Dowdy case apply. In the Chilton case, another action was pending for the recovery of fees received by the county attorney in excess of his constitutional limit, and, in a separate action, this court refused to declare the rights of the parties on the question of procedure as to which party had the burden of proof; or to determine the question of limitation; or to say whether the constitutional provisions involved are self-executing. We held that to do so would convert our jurisdiction from appellate to original, nor would it have ended the litigation. In the Warehouse case, the U. S. Supreme Court decided that it had no jurisdiction to review a mere declaratory judgment of a state court.

Under Sec. 639a—6, Civil Code of Practice, courts have a discretion as to whether they will exercise their

power to declare rights in cases where the decision would not terminate the controversy, or where the declaration is not necessary or proper at the time under all circumstances, Supreme Tent of the Knights of Maccabees of the U. S. v. Dupriest, 235 Ky. 46, 29 S. W. 2d 599. A declaratory judgment should give such relief that a second independent action need not be required and all matters should be litigated in one action, 1 C. J. S., Actions, sec. 18, page 1032.

The petition avers that $12,654.40 was deducted from the miners' wages as representing the weight of impurities loaded with coal, "and if it should be adjudged that the plaintiff is indebted to any of the defendants, the amounts due each of them can be readily ascertained and adjudged herein." The effect of this pleading is that the Company had in its hands this large sum of money, and the chancellor was asked to determine whether it was properly deductible under the contract between the parties and should be retained by the Company, or whether it was wrongfully deducted and should be returned to the defendants. Obviously, under this state of pleading, the chancellor could not have done otherwise than adjudge the fund belonged to the various miners, once he had adjudged it was wrongfully deducted by the Company.

We now take up the merits of the controversy. A former contract between the miners and operators expired on March 31, 1941. To prevent a suspension of coal mining, which would interfere with our national defense program, an agreement was made on March 30, 1941, between the miners and operators that coal mining would be continued under the old contract pending negotiations of a new one, except as to certain increases in pay. A general or master contract known as the Southern Wage Agreement was executed on July 5, 1941, between the miners union and the operators' association, while the various mines and local chapters of the union negotiated their several contracts later; but the Southern Wage Agreement and the local contracts were all effective as of April 1, 1941. The local contract before us for construction recites that the Southern Wage Agreement is made a part thereof. The Southern Wage Agreement provides on page 46: "Reject clauses providing as follows should be eliminated from all District

agreements: * * * (Then follows the two eliminated paragraphs relative to deductions for impurities in the coal.) All reject clauses of a similar character should be eliminated from District agreements.''

Section 4 of the District agreement recites that the removal of the "reject clause" therefrom makes it necessary that clean coal be loaded, and then provision is made for the warning, laying off, or even discharge of the offending miners who load coal containing debris or impurities. The District agreement further provides that inspectors may be designated by the Company who shall estimate the weight of the impurities in each miner's car of coal and this estimated weight shall be deducted from the car. The District contract recites other methods of dockage and discipline which may be mutually agreed upon.

From May 1 to July 20, 1941, the Company deducted 200 pounds for impurities from each mine car, and from July 21, 1941, to September 9, 1942, 100 pounds was deducted from each car. After the latter date, no deductions were made as there was such a demand for coal during war times that the purchasers were willing to take the impurities along with the coal. The Company claims the right to make these deductions under the fourth paragraph of the District agreement.

It is admitted that the District agreement must prevail unless it is in irreconcilable conflict with the Southern Wage Agreement. We are not prepared to say that the two contracts are in conflict, but we do say that under neither may the Company deduct a fixed or arbitrary number of pounds on account of impurities unless the miners and operators agree upon such a figure. There was no such agreement in this instance.

The Southern Wage Agreement eliminates "reject clauses" from all District contracts but contains a clause that each District agreement shall provide for the proper cleaning of coal, and proper disciplinary rules and penalties shall be incorporated therein. In paragraph 4 of the District contract, provision is made for warning the miner on the first offense of loading impurities; then he shall be suspended for two days for the second offense; and for the third offense within thirty days, he may be suspended for five days or discharged. But nowhere

does it permit the operator to arbitrarily deduct 200 pounds, 100 pounds, or make any deduction, from each mine car for impurities, although it does permit the operators to install inspectors whose duty it is to estimate the weight of the impurities in each car and deduct it from the total weight of the car.

This record shows the 200 pounds, as well as the 100 pounds deduction, was taken from each car arbitrarily by the Company as representing the average amount of impurities employees of the Company thought each car contained, but it was not the result of an estimate made by an inspector. Furthermore, the national representative of the United Mine Workers of America, or the miners, or their district officers, knew nothing of the deductions until a check-weighman was elected in July 1941.

It is argued that the deductions were made under the contract expiring March 31, 1941, and that contract was in force and effect until the present District contract was adopted on October 11, 1941. However, both the Southern Wage Agreement and the District contract provide each shall become effective as of April 1, 1941. We are unable to follow the reasoning of the learned counsel for appellant that the District contract did not condemn the practice of making deductions for impurities but only provided for the elimination of ''reject clauses'' in future contracts. The Southern Wage Agreement, effective as of April 1, 1941, outlawed ''reject clauses'' and that was made a part of the District contract, which later also in paragraph 4 recited the ''reject clauses'' had been eliminated.

The judgment is affirmed.